828 So.2d 851 (2002)
Karen CUEVAS, Appellant,
v.
COPA CASINO and Employers Insurance of Wausau, Appellees.
No. 2001-WC-01195-COA.
Court of Appeals of Mississippi.
October 15, 2002.
*852 J.D. Lee, Biloxi, attorney for appellant.
Jessica S. Upshaw, Gulfport, attorney for appellee.
Before McMILLIN, C.J., BRIDGES, and THOMAS, JJ.
THOMAS, J., for the court.
¶ 1. Karen Cuevas filed a petition to controvert with the Mississippi Workers' Compensation Commission on June 5, 1995, alleging that she sustained injuries to her right shoulder, arm, neck, and lower back in a fall while working at the Copa Casino on June 23, 1994. The petition was answered by the employer/carrier on July 14, 1995. A hearing was held on October 27, 1997, before an administrative law judge. On July 1, 1998, the administrative law judge found that Cuevas sustained an injury to her right elbow and shoulder only in the fall, and awarded her benefits from June 23, 1994, to August 16, 1994, and medical expenses for the initial treating physician only. Cuevas was thus denied benefits relating to her back and neck injuries. She appealed to the Full Commission, which affirmed the administrative law judge's decision. Cuevas then appealed to the circuit court which affirmed the Commission's decision. Aggrieved, Cuevas perfected an appeal to this Court and asserts the following issues:
I. CLAIMANT'S CURRENT MEDICAL CONDITION IS CAUSALLY RELATED TO HER WORK RELATED ACCIDENT AND SHE IS THEREFORE ENTITLED TO TEMPORARY TOTAL DISABILITY BENEFITS.
*853 II. ALL MEDICAL CARE RECEIVED BY CLAIMANT WAS REASONABLE AND NECESSARY FOR HER WORK RELATED INJURY, THEREFORE THE EMPLOYER/CARRIER SHOULD BE RESPONSIBLE FOR ALL EXPENSES.
III. CLAIMANT HAS NOT YET REACHED MAXIMUM MEDICAL IMPROVEMENT, THEREFORE NO DETERMINATION CAN BE MADE AS TO HER LOSS OF WAGE EARNING CAPACITY.
Finding no error, we affirm.

FACTS
¶ 2. Karen Cuevas began working as a card dealer for Copa Casino beginning at Copa's opening in September 1993. Cuevas is a high school graduate with a diploma in executive secretarial studies from a business college. She has held positions as a veterinary assistant, cashier, counter clerk, food server, and waitress. She was approximately thirty years of age when she went to work for Copa. As a dealer, she was required to pick up containers of coins, make repeated movements of her arms and neck including dealing cards, and stretch across the game table to pick up cards and coins.
¶ 3. While reporting for work on June 23, 1994, Cuevas walked across a wet parking lot before going up the inside stairs at the Copa Casino, which were covered with grooved rubber material. On the way up the stairs, Cuevas claimed her feet slipped out from under her and she fell forward. She tried to catch herself with her right arm on the handrail, and claimed that her arm was wrenched behind her as she fell. There were no witnesses to Cuevas' fall. She testified at trial that she immediately felt burning pain on her right side from her neck to the top of her shoulder.
¶ 4. With assistance from other employees, Cuevas went first to the employee break room and then to the first aid station and filled out an accident report. On the accident report, Cuevas wrote that her shoulder and elbow hurt, and she checked boxes on a body diagram indicating right shoulder and right elbow and wrote in "elbow and shoulder pain." Arrangements were made for Cuevas to see a company selected physician at a local urgent care facility. Her husband was called and he took her to see the doctor.
¶ 5. Cuevas signed a form selecting the physician at the urgent care facility as her choice of doctor. This physician was Dr. Richard Peden, a board certified occupational medicine specialist. Cuevas testified at the hearing that she did not know that she was told the consequences of signing the form stating that Dr. Peden was her choice. Debra Cortes, employee benefits coordinator for Copa, testified that she explained the choice of physician form to Cuevas before she signed it.
¶ 6. Dr. Peden examined Cuevas and diagnosed a second degree sprain to the right shoulder. He did not place any restrictions on her, finding she had full range of motion in her shoulder, and released her back to full duty work with Cuevas' voluntary agreement to do so. Dr. Peden prescribed an anti-inflammatory drug. Cuevas finished her shift that day to 8:00 p.m., and worked for another five weeks. Cuevas returned to Dr. Peden on August 1, 1994, complaining of continued pain in the right shoulder, stating that her elbow was better but that she thought she had pulled her right shoulder again. Dr. Peden put Cuevas back on the anti-inflammatory medication and gave her a steroid along with a local anesthetic. On a follow-up visit the following week, Dr. Peden evaluated *854 Cuevas' shoulder sprain as seventy percent resolved and progressing to normal. Dr. Peden saw Cuevas for the last time on August 16, 1994, and he again found normal range of motion and no tenderness in the shoulder. He found the right elbow and right shoulder problems fully resolved and she was released at maximum medical improvement from the Copa fall with no restrictions. For the first time at this visit, Cuevas complained of lower back pain and told Dr. Peden that she was taking Lorcet Plus, Flexeril, and Aleve that he had not prescribed. This medication had been prescribed by Cuevas' chiropractor, Dr. Jim Culveyhouse, whom she had seen according to his records due to her pulling her back while attempting to mow the lawn at her home one weekend in mid-August. Cuevas did not report the lawn mowing incident to Copa or to Dr. Peden.
¶ 7. Cuevas had not missed any work from the initial fall at Copa until August 12-14, after the incident with the lawn mower. After several months, Cuevas complained of continued pain and went to see Dr. Hansel Janet, her family physician in Gulfport, complaining of headaches and pain in her shoulder and back. Dr. Janet hospitalized Cuevas in November 1994, and referred her to Dr. Harry Danielson, a neurosurgeon. While being treated by Dr. Danielson, Cuevas complained of lower back and spinal pain from a work-related fall. She told him about a car wreck in 1993 but indicated she felt she had gotten over those injuries. Dr. Danielson had an MRI performed which Danielson determined showed a herniated disc that was not indicative of surgical intervention at that time. Dr. Danielson released Cuevas back to work with no restrictions with a follow-up exam in January 1995. In January, Danielson determined Cuevas was in need of surgery, which he performed on February 10, 1995. Cuevas complained that the surgery gave only temporary relief. Danielson released Cuevas on June 6, 1995, as having reached maximum medical improvement and assigned a nine percent impairment rating to the body as a whole.
¶ 8. On August 8, 1995, Cuevas went back to Danielson complaining of pain. Danielson referred Cuevas to a pain specialist, Dr. Benson, who began treating her with injections. Danielson also later referred Cuevas to Dr. Whitecloud at Tulane University Medical Center when Cuevas expressed anger at Danielson's remark that he had nothing more to offer her. Dr. Whitecloud performed a battery of tests on Cuevas and found a disc protrusion on the spine. Dr. Whitecloud testified that she had not reached maximum medical improvement, but that he would defer to Dr. Danielson's opinion regarding Cuevas' ability to return to work. Dr. Whitecloud noted that Cuevas had, in his opinion, preexisting injuries due to the deterioration of her discs.
¶ 9. Dr. James Butler examined Cuevas for the employer/carrier in December 1996. Dr. Butler reviewed her medical records, including the reports of the fall and the car wreck that occurred in 1993, as well as the tests performed on her in the course of her medical treatment. Dr. Butler found that Cuevas would have reached maximum medical improvement approximately six months after her surgery of February 1995, or August 1995. After reviewing the functional capacity examination, Butler agreed with the restrictions and stated that Cuevas could return to full-time work at a light-duty rating. Dr. Butler also testified that he could not relate Cuevas' complaints of back pain to the work injury at Copa Casino, nor did he relate the cervical surgery to the fall. He did assign an impairment rating of 10% to the whole body because of the neck surgery and residual chronic neck pain. Although *855 Cuevas had problems with her bladder and saw a urologist for complaints of frequent urination, Dr. Butler found no evidence of herniation or nerve compression in the MRI studies and therefore felt that the bladder problem could not be related to the Copa fall. Cuevas had a history of bladder problems according to the records of her family physician, Dr. Janet.
¶ 10. Cuevas' employment records show that she was employed with Copa from its opening in September 1993, until January 1995, when she applied for medical leave of absence which was to end April 19, 1995. After three days of "no call, no show," she was terminated as per company policy on April 21, 1995. Since that date, Cuevas has not attempted to find work. A functional capacity examination on August 14, 1996, indicated that Cuevas was capable of light work. During the functional capacity examination, Cuevas was found to have self-limiting behavior but nevertheless her abilities were found to match the job description of dealer at Copa. Cuevas testified that she did not look for work because she was still undergoing medical treatment and her bladder problem and use of a catheter creates a problem in public places.
¶ 11. Debra Cortes, employee benefits coordinator for Copa, testified that Cuevas missed three days in August 1994 after the fall. In September, Cuevas called in on three days to report being sick. In October, she was sick one day and left early on one day. Cuevas did not tell Copa that she injured her head, back, or neck, in the fall. Cuevas also did not notify the casino that she was seeing Dr. Danielson until January 1995 when she requested a medical leave of absence. Even then, she did not advise Copa that the leave of absence was related to the fall at the casino.
¶ 12. A pit supervisor for Copa testified that Cuevas didn't seem to have any difficulty performing her job as a dealer after June 1994. Another Copa employee, John Spillman, testified that he saw Cuevas one evening in a bowling alley with several other women while out on medical leave in April 1995. Spillman testified that he spoke to the women who were "sitting, cutting up, laughing, and joking." Spillman testified that he did not see Cuevas bowl, but that she was not wearing a neck brace when he came into the bowling alley. Shortly after he spoke to the women, Cuevas put on the neck brace and her mood changed to somber, according to Spillman. Stacy Richards, a dealer at Copa, accompanied Spillman to the bowling alley that night and verified Spillman's account.
¶ 13. After a hearing in October 1997, the administrative law judge found that Cuevas sustained a work related injury to her right elbow and shoulder only and therefore did not award benefits for neck or back injuries. Cuevas appealed to the Full Commission which affirmed the administrative law judge in September 1999. Cuevas appealed to the Harrison County Circuit Court which affirmed the Full Commission. Cuevas then appealed to this Court.

ANALYSIS
I. IS CLAIMANT'S CURRENT MEDICAL CONDITION CAUSALLY RELATED TO HER WORK RELATED ACCIDENT AND IS SHE THEREFORE ENTITLED TO TEMPORARY TOTAL DISABILITY BENEFITS?
¶ 14. The standard of review utilized by this Court when considering an appeal of a decision of the Workers' Compensation Commission is well settled. The Mississippi Supreme Court has stated that "[t]he findings and order of the Workers' *856 Compensation Commission are binding on the Court so long as they are `supported by substantial evidence.'" Vance v. Twin River Homes, Inc., 641 So.2d 1176, 1180 (Miss.1994) (quoting Fought v. Stuart C. Irby Co., 523 So.2d 314, 317 (Miss.1988)). This Court will reverse only where a Commission order is clearly erroneous and contrary to the weight of the credible evidence. Vance, 641 So.2d at 1180; see also Hedge v. Leggett & Platt, Inc., 641 So.2d 9, 12 (Miss.1994). "This Court will overturn a [C]ommission decision only for an error of law or an unsupportable finding of fact." Georgia Pacific Corp. v. Taplin, 586 So.2d 823, 826 (Miss.1991) (citations omitted). Therefore, this Court will not overturn a Commission decision unless it finds that the Commission's decision was arbitrary and capricious. Id.
¶ 15. Cuevas contends that there is a causal connection between her fall at the Copa Casino and the medical problems for which she has sought treatment. The administrative law judge found otherwise, and Cuevas argues that this finding is against the overwhelming weight of the evidence. Although there is some conflict in the medical evidence presented, the administrative law judge found that Cuevas was able to persuade some doctors that her symptoms were causally related to her fall at the Copa Casino because she told them that the problems were related. Cuevas bears the burden of proving her case "by a fair preponderance of the evidence." Bracey v. Packard Elec. Div. General Motors Co., 476 So.2d 28, 29 (Miss.1985). Recovery, if any, must be based on "reasonable probability and not possibility." Id. (citing Burnley Shirt Corp. v. Simmons, 204 So.2d 451, 453 (Miss.1967).
¶ 16. Cuevas' fall was not witnessed, but her initial injury report signed by Cuevas complained of an ache in her shoulder and elbow. On a form, Cuevas marked the right shoulder and right elbow and checked "arm" and wrote in "elbow and shoulder pain." There was no mention of anything related to the neck or back on this initial visit. Dr. Peden, a board certified specialist in occupational and environmental medicine, reviewed the report and examined Cuevas, finding normal range of motion and diagnosing a sprained right shoulder and elbow. Dr. Peden released Cuevas back to work, which she did, and subsequent office visits showed improvement. Cuevas did not tell Dr. Peden about her attempt at mowing the lawn on August 11, after the fall, but Dr. Peden did notice that she reported new medications which he did not prescribe. Dr. Peden released Cuevas without restrictions on August 16, 1994. Cuevas did not notify Copa that she was having any difficulties performing her job as a dealer after this date. She also did not request authorization or notify Copa that she was seeing another physician. Six months later, when Cuevas notified Copa that she was to undergo cervical surgery, she did not inform Copa that she felt the surgery was related to her fall.
¶ 17. The medical evidence that Cuevas relied on to prove the causality between her fall and the medical care she received comes from Dr. Danielson, Dr. Whitecloud, and Dr. Benson. In Dr. Danielson's records, he initially evaluated Cuevas for left shoulder pain as well as pain in her low back and spine. This is opposed to the right shoulder which she claimed to have injured in her fall at Copa. Although Dr. Danielson related Cuevas' back problems to the fall, he testified that he was relying on her statements to him. Dr. Danielson's assessment of an MRI performed upon Cuevas was also quite different than the analysis of the same MRI made by Dr. *857 Butler, who disagreed with Dr. Danielson and found no herniation present. By not obtaining permission to seek other medical care, the doctors relied on Cuevas to tell them what happened and how she was initially injured rather than them being able to examine the accident report and examination made by Dr. Peden.
¶ 18. Dr. Whitecloud admitted in his testimony that he made his opinion based on Cuevas' statements and without reviewing the injury report or other records. Based on Cuevas' complaints, Dr. Whitecloud ordered discograms which he admitted are controversial diagnostic tests. Based on these discograms, Whitecloud advised Cuevas to consider surgery on her cervical spine. Both Dr. Danielson and Dr. Butler testified that discograms were not reliable diagnostic tests in their opinions. Dr. Whitecloud's records also included discrepancies when compared with the initial report of the fall, including stating that Cuevas slipped in a puddle of water on the stairs at the casino.
¶ 19. There is substantial medical evidence to support the findings of the administrative law judge and the Full Commission. The only medical evidence causally connecting Cuevas' fall to any problems she might have had comes from doctors who Cuevas saw without permission or notification of Copa. Those doctors admittedly received all of their information from Cuevas, a great deal of which differed from her initial injury report and examination after the fall. For several months after the fall, Cuevas continued to work at the casino without complaint to Copa and with very few missed days or early outs. The Commission's fact finding is supported by substantial evidence, and will therefore not be reversed by this Court. R.C. Petroleum, Inc. & Travelers Ins. Co. v. Hernandez, 555 So.2d 1017, 1021 (Miss.1990). This issue is without merit.
II. WAS ALL MEDICAL CARE RECEIVED BY CLAIMANT REASONABLE AND NECESSARY FOR HER WORK RELATED INJURY, AND SHOULD THE EMPLOYER/CARRIER BE RESPONSIBLE FOR ALL EXPENSES?
¶ 20. The Workers' Compensation Act was created in order for industry to cover the expenses that occur in its operation, passing the expense from the public to the consumers of the products of industry. Joe Ready's Shell Station, & Cafe v. Ready, 218 Miss. 80, 89, 65 So.2d 268, 271 (1953). "Since industry must carry the burden, there must then be some causal connection between the employment and the injury, or it must have had its origin in some risk incident to or connected with the employment, or have followed from it as a natural consequence." Id. at 272. The administrative law judge and Full Commission found no causal connection in this case, and the substantial medical evidence supports this finding. Therefore, all medical expenses not authorized by Copa that Cuevas sought and received were not reasonable and necessary for Cuevas' injuries to her arm suffered in the fall. This issue is without merit.
III. HAS CLAIMANT NOT YET REACHED MAXIMUM MEDICAL IMPROVEMENT, AND THEREFORE CAN NO DETERMINATION AS TO HER LOSS OF WAGE EARNING CAPACITY BE MADE?
¶ 21. Cuevas asserts that she has not yet reached maximum medical improvement and that she has therefore not attempted to find work. Dr. Peden assessed maximum medical improvement from the fall at Copa as of August 16, 1994. Cuevas was never placed off work for the fall at Copa, and continued to work *858 from the date of the fall until January of the next year. Even if Cuevas had proven a causal connection, the claimant must make a reasonable effort to seek employment in either a similar job or something within their limitations. Thompson v. Wells-Lamont Corp., 362 So.2d 638, 640 (Miss. 1978). One attempt at finding employment has been held to not be sufficient. Compere's Nursing Home v. Biddy, 243 So.2d 412, 414 (Miss.1971). Cuevas admits to not making any attempts. This issue is without merit.
¶ 22. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED. COSTS OF THE APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, LEE, IRVING, MYERS, CHANDLER AND BRANTLEY, JJ., CONCUR.