GRIFFIS, J.,
Concurring in Part, Dissenting in Part:
¶ 46. I concur with the majority on the resolution of the cross-appeal. I respectfully dissent from the majority’s resolution of the issues raised by Texas Gas/Liberty Mutual.
¶ 47. On September 1, 1992, Dabney was taken from work to the Baptist Memorial Hospital-DeSoto with a diagnosis of “hypertensive crisis” with chest pain and possible transient ischemic attack. He was admitted for cardiac evaluation, intensive care treatment and cardiac catheteri-zation. The hospital’s discharge summary read:
Chronic left leg problems secondary to trauma, past history.
* * *
He was also complaining of peripheral neuropathy like symptoms and B-12 and Folate levels were done. He was found to be B-12 deficient. This was felt to be secondary to partial gastrectomy and he required B-12 supplementation that was instituted during this admission.
* * *
He also experienced some numbness in his left arm and two fingers on the left side. He has a history of chronic two-pillow orthopnea. Does have occasional paroxysmal nocturnal dyspnea and pedal edema. His edema is usually on the left side associated with old injuries.... Status post-trauma to his left leg with multiple surgery and residual swelling. .... He does have some swelling of his left lower extremity compared to the right. This is chronic by history.
Dabney testified that he incurred a snake bite at work as the cause for this hospitalization on September 1, 1992 but he was released with a primary diagnosis of hypertensive crisis. The administrative law judge’s order conceded the facts of the snakebite offered by Dabney was “sketchy at best.” More significantly, however, there was no medical history or objective findings during Dabney’s ten day hospitalization that he suffered a snakebite, puncture wound or even cut to his lower extremities despite fully and complete medical evaluation, diagnostic testing and detailed physical examinations of lower extremities.
¶ 48 On October 13, 1992, more than a month later, Dabney saw Dr. Tom Morris for “either an insect or snake bite of the left calf 3 weeks ago.” On October, 17, 1992, Dabney was again admitted to the hospital again. Dr. Morris treated Dab-ney for an infection to his left calf believed to be caused by a bacterial penetration. After treatment with antibiotics, the infection resolved itself, and Dr. Morris confirmed the date of maximum medical improvement for the left leg injury/infection was January 4, 1993. In June of 1993, Dabney apparently had a flare-up or recurrence of the leg infection, which was also treated with antibiotics and resolved by Dr. Morris. At his deposition, Dr. Morris could not state with a reasonable degree of certainty what caused the June, 1993 recurrence. Dr. Morris testified the second point of maximum medical improvement for the left leg injury regardless of the cause of the recurrence was July of 1993. Dabney did not have any further reoccurrence of the infection after July of 1993, and he received no further *1093 mediation treatment for his left leg infection after that date. Dr. Morris never treated Dabney for polyneuropathy.
¶49. Dabney first visited Dr. Cape three years later, on October 27, 1995. Dr. Cape eventually diagnosed Dabney with the condition of polyneuropathy. Dr. Cape opined that snake venom was the cause of Dabney’s polyneuropathy. The administrative law judge relied on Dr. Cape’s opinion that Dabney’s polyneuro-pathy was caused by copperhead snake venom primarily because “it is well established that [ALJ’s] give additional credence to the testimony of treating physicians.”
¶ 50. The appellants argue that Dr. Cape’s opinion testimony was speculative and unreliable because it was not based on substantial evidence or recognized and peer-tested medical science. Dr. Cape stated in his deposition the grounds for his opinion that the Dabney’s condition of po-lyneuropathy was caused by the snakebite comes only from what Dabney told him via patient history. The appellants claim that basing such a critical and radical medical opinion merely on patient history is not a scientific but a mere copying of Dabney’s complaints. Dr. Cape testified:
A. I feel he had an autonomic neuropa-thy, secondary to the venom toxicity of the snake.
* * *
Q. Is that condition caused directly by the snake-bite he reported in September 1,1992?
A. By history, it is. He said he had the snake bite and then he got the symptoms. When I examined him, he had evidence of that.
* * *
Q. My question is whether or not the snake venom, is there some objective test to prove that his neuropa-thy is causally related to the snake bite of '92?
A. No, there is no objective test. It’s only his response to treatment that makes the diagnosis of autonomic neuropathy and there are other causes of autonomic neuropathy other than snake bite, but primarily we implicate the snakes.
[[Image here]]
Q. I would like to know what is the basis of your opinion that the neuro-pathy is caused by the snake bite of 1992?
A. Historical. He stated the symptoms began the day after he got bit by the snake.
Q. Besides subjectively telling you that, do you have any other objective evidence?
[[Image here]]
A. This has been questioned by someone every time I turn around. The insurance company and the Methodist Hospital questioned it .... and I go by his history and in his history, he stated he had — I’ve known him 5 or 6 years or so, and he’s always been very honest and straight forward, and historically he told me had a snake bite and the day after he got this, he had the symptoms. .... But if they tell you that, you take their word or if they tell you they fell out of a building, you take their word.
[[Image here]]
Q. Okay. Now, I guess my understanding basically is the gist of your testimony is because he didn’t have these conditions before of numbness in his history and now he does, you are putting a time relationship in there; is that a fair statement?
A. Right.
*1094 ¶ 51. Dabney did not present any medical records or reports to Dr. Cape. Instead, Dr. Cape simply wrote down what Dabney told him about his medical history. The medical records of the initial hospitalization, beginning on September 1, 1992, states Dabney complained of peripheral neuropathy type symptoms upon admission and further admitted that this was a chronic condition which occurred prior to September 1,1992.
¶ 52. Cross-examination of Dr. Cape revealed three significant facts which prove his opinions of a causal relationship are unreliable. Dr. Cape confirmed that if Dabney had not informed him by subjective history that he had “numbness” the day after the snake bite, he would not have related the snake bite to the polyneuropa-thy when Dr. Cape testified “if he had had it [numbness] weeks or months later, I probably wouldn’t have related it to that.” The central basis of Dr. Cape’s opinions that Dabney’s peripheral polyneuropathy was caused by the incident of September 1, 1992 was because Dabney complained of left leg numbness via patient history is contradicted by Dabney’s medical records. The records from the September 1, 1992 hospitalization, which were never reviewed by Dr. Cape, confirmed Dabney’s history of longstanding pre-existing peripheral neuropathy like symptoms upon admission on the date of the incident. Thus, Dab-ney’s medical records provide substantial evidence that the numbness in Dabney’s extremities which Dr. Cape relied upon to make his causal relationship opinion was not a new condition caused by the snakebite but was indeed chronic and occurred years before. Dr. Cape admitted that he would not relate the peripheral polyneuro-pathy to snakebite venom if the symptoms of numbness “developed weeks or months after the incident.” Of course, the discovery that the numbness actually pre-existed the snake bite confirms Dr. Cape’s opinions on medical causation are unreliable.[3]
¶ 53. Drs. Morris and Baxter were the only physicians who treated Dabney after the September 1, 1992 incident up to the point where Dr. Cape became involved. Dr. Morris’ records, for the time period immediately after September 1, 1992, indicates that Dabney only complained of pain and swelling in his left calf due to the infection. Dr. Morris’ records confirm Dabney made no complaints of numbness or neurological complaints throughout this treatment. In fact, on May 18, 1993, upon Dabney’s second admission for leg pain and swelling due to infection, Dr. Morris’ physical examination noted “NEUROLOGICAL: Neurovascular status of the lower extremity is within normal limits.” Likewise, the records of Dr. Baxter, Dabney’s longtime family physician, indicates that *1095 he treated Dabney for snakebite and secondary cellulitis in his lower leg without any complaints of neurological difficulty or left leg numbness. Despite what Dabney told Dr. Cape, the substantial medical evidence indicates that Dabney did not have any leg numbness or neurological complaints to his lower extremities (other than ones already present) until Dabney started seeing Dr. Cape three and one-half years later in July of 1995.
¶ 54. Next, Dr. Cape admitted Dabney suffered from six of at least twelve known risk factors, symptoms or pre-existing medical conditions which the medical community and authoritative text recognized as a cause of polyneuropathy.[4] Dabney’s medical records and testimony revealed he had other pre-existing and other medical conditions which are not related to his employment. Such conditions which are known causes of polyneuropathy include:
1. Gastrectomy removing 75% Dab-ney’s stomach wall, and vagotomy;
2. Chronic B-12 deficiency;
3 Alcohol intake of one six-pack per day or six pack per week;
4. Type II Diabetes;
5. History of chronic lower extremity swelling;
6. High blood pressure;
7. Peptic ulcer disease;
8. Fractured left tibia and fibula with nonunion and eight left leg surgeries from motor vehicle accident;
9. Anemia;
10. Cardiovascular disease with two heart attacks;
11. Hemotoma resulting from trauma to left leg;
12. Swelling of both lower extremities.
¶ 55. Finally, Dr. Cape was unable to cite to any medical literature, studies or authorities which supported his opinion that Dabney’s polyneuropathy was caused by copperhead snake venom, except for a list of “found articles” from “Google” where Dr. Cape inserted the search terms of “neuropathy and snake venom.” There was no evidence that Dr. Cape read these internet articles himself as a review of the actual articles with the search terms therein does not provide any medical or scientific support for Dr. Cape’s opinions that polyneuropathy can be caused by snake venom. The review of the articles did not provide any support for the conclusion that snake venom causes polyneuropathy and appearance of the search terms in these random articles is entirely inconsequential as these search terms are frequently paragraphs, if not numerous pages, apart. Dr. Cape testified there were numerous medical textbooks which established a link between snake venom and polyneuropathy. However, Dr. Cape could not identify recall any such texts or authority during his deposition.
¶ 56. Dr. Cape further admitted that he does not treat patients for snakebite or for snake envenomation. Most significant, Dr. Cape could not remember any other patient of his which had polyneuropathy caused by snake venom.
¶ 57. Dr. Vedanarayanan performed an independent medical review. He is a Professor of Neurology at the University of Mississippi Medical Center and is a Board Certified neurologist, who routinely treats polyneuropathy. Dr. Vedanarayanan has performed specific studies concerning the effect of snake bites on patients’ neurological systems upon presentation to the emergency room in his native country of India. Dr. Vedanarayanan opined that Dabney *1096 does not suffer from a diagnosis of autoimmune polyneuropathy, and he disagrees with Dr. Cape’s diagnosis. Dr. Vedana-rayanan testified there are specific tests to provide supportive evidence as to the determining cause of the diagnosis of poly-neuropathy. These tests include lumbar puncture, spinal fluid examination and a more extensive nerve conduction study or nerve biopsy. Dabney’s treating physicians failed to perform any of these additional tests, which concerned Dr. Vedana-rayanan.
¶ 58. Dr. Vedanarayanan testified that Dabney has a mild case of “sensory poly-neuropathy” and the most probable cause was his chronic B-12 deficiency, diabetes, alcohol use, and prior severe left leg trauma, all well known risk factors and symptoms which cause polyneuropathy. About the existence of any medical or scientific evidence that could establish a direct causal link between Dabney’s polyneuropathy and the snake bite incident of September 1,1992, Dr. Vedanarayanan testified:
Q. And, Doctor, specifically again as to Mr. Dabney, would the snake-bite. incident of September 1, 1992, when he was working for my client, Texas Gas, would that in your opinion have caused or contributed in any way to his sensory polyneuropathy?
A. Based on my review of literature, I see no association between the snakebite and the sensory polyneuropathy.
Q. Okay, can you explain more fully why you have that opinion that the snake-bite did not cause the sensory polyneuropathy?
A. Well, the main reason is snake-bites typically, if you break them down to the way I look at it, is two types. One is one that works on the clotting mechanism, called the hemotoxic, the second one that works on the nervous system. And amongst most of the nervous system — toxins that work on the nervous system — they work at the neuromuscular junction; that is, where the nerves and the muscles come together.
The typical presentation is usually one of weakness, with fatigue, and it’s quite rapid in onset and doesn’t generally produce sensory symptoms with it because it is acting at the level of the nerve at the muscle junction and it blocks the neurotransmitters’ effect at the neuromuscular junction. So it does not really have any direct effect on the nerve itself. And then it’s clear. So from a snake-bite, either you die from the neurotoxic snake-bite or you recover without any symptoms thereafter.
That’s been the experience of those 14 patients we have studied, plus the experience of my colleagues in southern India who have looked at a lot more patients previously who have had snake-bites, and none of them have had persistent or sensory complaints. So for those reasons, there is no biological mechanism by which we can think why it should effect the sensory nerves. And since there is no indication of an auto-immune process being involved, I feel that these two things, the polyneuropathy in him and the snake-bite, are unrelated.
¶ 59. Even though there was a disagreement among Dr. Vedanarayanan and Dr. Cape regarding the exact diagnosis of polyneuropathy as auto-immune or sensory, Dr. Vedanarayanan provided testimony with a hypothetical assumption that Dr. Cape’s diagnosis of auto-immune polyneu-ropathy was the correct one. Dr. Vedana-rayanan testified:
Q. Assuming for a second that Dr. Cape’s diagnosis of auto-immune polyneuropathy is correct, in your *1097 opinion, based on a reasonable degree of medical probability, would that diagnosis of auto-immune poly-neuropathy be in any way caused or contributed to by snake-bite or snake venom?
A. Okay. No, sir. There is no reported association, there is no case report, there is no reports; and plus, in my experience, and plus talking to other of my colleagues, you know, during the study that we performed, there is no association between snake venom and polyneuropathy.
Dr. Vedanarayanan’s expert report further confirmed that “there is no known association between a polyneuropathy and snakebite. My personal experience, as well as review of medical literature, shows no association between an acquired polyneuro-pathy and snake venom.”
¶ 60. Dr. Rick Carlton, an expert in the field of toxicology, reviewed Dr. Cape’s opinion. Dr. Carlton is a Board Certified physician in the fields of toxicology, emergency medicine and internal medicine. As the Associate Medical Director of the Mississippi Regional Poison Control Center, Dr. Carlton routinely treats patients with snakebites among other toxins. Dr. Carlton testified that he is very familiar with the types of venomous snakes indigenous to Mississippi and the effects caused by snake envenomation, and he treats dozens of snakebites each year for the Mississippi Regional Poison Control Center, the majority of which are bites from copperhead snakes, identified by its scientific name of Crotalidae. Dr. Carlton opined that there is absolutely no evidence to support a conclusion that Dabney’s peripheral polyneu-ropathy was caused by, or even related to, a snakebite as there had never been any report, study or medical literature relating the two. Dr. Carlton’s conclusion was that medical treatment for snakebites last for a few months but never years as alleged here. Snakebites cause an acute reaction that will resolve itself and not cause future “flare-ups” or latent medical conditions after a few weeks much less three years as is the opinion of Dr. Cape. Dr. Carlton also explained that copperhead bites are normally the most insignificant venomous snake bites that he treats. Dr. Carlton explained that copperhead venom does not have much, if any, “neurological effect, or toxic effect on the nerves of a human.” Dr. Carlton also explained the normal course of treatment for a copperhead bite does not call for immediate anti-venom but rather routine medical treatment such as tetanus immunization, possible antibiotic therapy, pain medication, and elevation of the wound. Dr. Carlton’s treatment of snakebite victims normally only includes 6 to 12 hours of observation in an emergency room and rarely a follow-up visit. Further, even with a copperhead bite of severe envenomation, Dr. Carlton knew of no long term effects, other than possible skin grafts which occur in these cases and certainly no subsequently developing neurological disease. Finally, Dr. Carlton confirmed he has never seen any case where polyneuropathy is caused by snake venom and emphatically testified that Dabney’s medical condition of peripheral polyneuro-pathy was not caused by copperhead snake venom.
¶ 61. Terry Vandeventer, an expert herpetologist, testified regarding the immediate reaction to a snake bite, and particularly a copperhead snakebite where actual envenomation occurred. Significantly, out of the known symptoms and effects copperhead snake venom has on humans, these symptoms do not include numbness. Vandeventer also described the indigenous snakes to Mississippi and testified the only venomous snake in Mississippi which would have possible toxic effects on a human’s nervous system was a coral snake *1098 found only in southern Mississippi, far away from Dabney. Any “neurotoxin” of a copperhead bite is not known to actually effect individual nerves, but the neuromus-cular junction. Vandeventer testified that copperhead venom has a “hemorrhagic” which effects a victim’s circulatory system and breaks down blood vessels. Mr. Van-deventer also explained the standard protocol for first aid and medical treatment of snakebites and any known long-term medical effects, which would Mr. Vandeventer confirmed would only be pain and tenderness lasting for a month to a maximum of four months. After the three or four month period, Mr. Vandeventer testified there is no future medical treatment necessary for a victim bitten by a copperhead snake with actual envenomation.
¶ 62. Dabney failed to prove that his polyneuropathy was caused by the snake bite. There is no expert, scientific, medical evidence which establishes by the required reasonable degree of scientific probability that copperhead snake venom causes polyneuropathy. The only evidence offered to establish a possible causal relationship is from Dr. Cape who based his opinion entirely on subjective medical history told to him by Dabney, without support of any scientific or medical tests, studies, literature, authorities or even review of Dabney’s previous medical records. Simply put, Dabney failed to offer any credible evidence of causation, and the findings of the Commission should have been reversed by the Circuit Court.
¶ 63. While deference is given to the findings of the Commission, the Mississippi Supreme Court has stated that it will not simply “rubber stamp” decisions from the Commission, and will not hesitate to reverse the Commission when there is “no evidence or only a scintilla of evidence” to support that decision. Metal Trims Industries, Inc. v. Stovall, 562 So.2d 1293, 1297 (Miss.1990). This Court recently held that:
[E]ven though medical evidence is to be given liberal construction and that doubtful cases should be resolved in favor of compensation, the Commission is called upon to apply “common knowledge, common experience and common sense” when weighing the evidence. See Miller Transporters, Inc. v. Guthrie, 554 So.2d 917, 918 (Miss.1989); Hill v. United Timber & Lumber Co., 68 So.2d 420, 424 (Miss.1953). The adherence to a liberal standard does not avoid the requirement that the claimant must also prove in order to recover. It is well settled that proof of causal connection must rise above mere possibility. Fought, 523 So.2d at 317. These type of cases require expert medical opinion to help establish causation.
Janssen Pharmaceutica, Inc. v. Stuart, 856 So.2d 431 (Miss.Ct.App.2003).
¶ 64. Here, the only evidence offered by Dabney that his medical condition of peripheral polyneuropathy was caused by a snakebite occurring at work was the uncorroborated, unscientific and speculative testimony of Dr. Cape. Indeed, Dr. Cape’s opinion was based solely on what Dabney told Dr. Cape in his medical history. The credibility of what Dabney told Dr. Cape is questionable when considered along with established medical evidence that Dabney complained of these same conditions years before the snake bite. Also, the review of the treating physicians records, for treatment immediately after the incident, indicates that Dabney’s underlying condition of polyneuropathy was not symptomatic until three years post-incident.
¶ 65. Further, the experts who routinely treat snakebite patients, Dr. Carlton, or who have performed studies of snakebite envenomation on human nerves, Dr. Veda-narayanan, clearly established there is no *1099 recognized medical or scientific link between copperhead snake venom and poly-neuropathy. The claims of a diagnosis by exclusion and from patient history performed by Dr. Cape is speculative, improper and not based on generally accepted scientific principles in this field. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); Kansas City Southern R.R., Inc. v. Johnson, 798 So.2d 374 (Miss.2001); Frye v. U.S., 293 F. 1013 (D.C.Cir.1923).
¶ 66. Mississippi appellate courts have routinely held that medical causation of a claimant’s medical condition to his employment is a prerequisite for recovery in workers’ compensation claims under Mississippi law. The Court has routinely ruled “in all but the simple and routine cases, ..., it is necessary to establish medical causation by expert testimony.” Cole v. Superior Coach Corp., 234 Miss. 287, 106 So.2d 71, 72 (1958); Calhoun Apparel, Inc. v. Hobson, 770 So.2d 539, 541 (Miss.Ct.App.2000); Kersh v. Greenville Sheet Metal Works, 192 So.2d 266, 268 (Miss.1966). Further, the wide deference in favor of an employee’s claim in a workers’ compensation litigation does not apply to the strict requirement of expert medical causation to the claimed injury and employment based on generally accepted scientific principles. Olen Burrage Trucking Co. v. Chandler, 475 So.2d 437, 439 (Miss.1985). “In cases such as this, medical proof is essential to establish the necessary causation.” Turner v. J.P. Mills Co., 736 So.2d 519, 521 (Miss.Ct.App.1999).
[T]he burden, as usual, is upon the Claimant and that the rule of liberality cannot dispense with the necessity of proof of facts prerequisite to recovery and the causal connection is one of such facts. The factual issue on this score is usually one for the medical experts and the Commission as triers of the fact, and the Commission may not aivard compensation in the absence of medical proof to show causal connection.
Kersh v. Greenville Sheet Metal Works, 192 So.2d 266, 268 (Miss.1966) (emphasis added). See Janssen, 856 So.2d at 436 (explaining that “in workers’ compensation cases, claimant has the burden to show an accidental injury arising out of and in the course of employment and a causal connection between the injury and the claimed disability”).
¶ 67. As in all cases where experts provide their specialized knowledge to assist the trier of fact, the medical evidence provided in a workers’ compensation claim must be based on “reasonable probability and not possibility.” Bracey v. Packard Elec. Div., General Motors Co., 476 So.2d 28, 29 (Miss.1985). “It is well settled that proof of causal connection must rise above mere possibility.” Kirk v. K-Mart Corp., 838 So.2d 1007 (Miss.App.2003); Dunn, Mississippi WORKERS’ Compensation, § 273 (3d ed.1992).
¶ 68. In Cuevas v. Copa Casino, 828 So.2d 851 (Miss.Ct.App.2002), this Court denied benefits and medical treatment to a claimant for alleged back injuries as there was no expert medical/scientific evidence that the back injury was caused by her employment. The claimant’s only evidence of causation between her work-related slip and fall and her back pain was unsupported and speculative testimony from her treating physician who based his opinions on Cuevas’ subjective statements given in her medical history. We found that such evidence did not support a causal relationship, especially in light of other medical/scientific evidence offered by the employer/carrier that Cuevas’ complaints of back pain were not caused by the slip and fall at work. Id.
¶ 69. Just as in Cuevas, Dabney’s physicians offered only speculative opinions *1100 concerning causation that were not based on any scientific knowledge connecting a copperhead bite and polyneuropathy. Such speculation cannot support a finding that Dabney’s polyneuropathy was work related, as not only was there not any credible evidence of causation, there is no scientific evidence at all supporting causation. The appellants have submitted substantial and credible evidence that a copperhead snakebite will not cause polyneuropathy. There was undisputed testimony that copperhead venom is not a neurotoxin and does not have any affect on the nervous system. All of the credible scientific evidence shows that there is not a causal connection between Dabney’s snakebite and the occurrence of polyneuropathy.
¶ 70. In Janssen Pharmaceutica, Inc. v. Stuart, 856 So.2d 431 (Miss.Ct.App.2003), the claimant was involved in a motor vehicle accident returning to the airport for a work-related business trip. Id. at 433. Over two months later, the claimant reported to the emergency room claiming unbearable back pain. Numerous treating physicians and experts submitted testimony, and this Court found that the claimant failed to prove a causal connection between the work-related motor vehicle accident and his subsequent back pain/injury. Id. at 437. We affirmed the finding that the testimony of treating physicians that a causal relationship between the subject motor vehicle accident and claimant’s back injury was a “possibility” did not rise to the level of substantial evidence to support a claim for workers’ compensation benefits. Id.
¶ 71. In Kirk v. K-Mart Corporation, 838 So.2d 1007 (Miss.Ct.App.2003), this Court found that claimant failed to prove a direct causal relationship between her alleged mental injury/disability and her work-related trauma. This Court focused on the testimony of treating physicians that a causal relationship “may” be established and confirmed the Commission’s finding that such inconclusive testimony “does not sound to us in terms of reasonable and dependable medical probabilities, but merely in terms of possibility.” Id. at 1011.
¶ 72. The majority here concludes that “there is substantial evidence that Dab-ney’s condition of polyneuropathy was caused by a snakebite.” The majority states that there Commission properly relied on Drs. Baxter and Cape. I disagree. I do not believe that this is an issue of weighing credibility. Rather, I find that there is simply no evidence to support these opinions. None of Dabney’s treating physicians performed any test that could link the occurrence of polyneuropathy with a copperhead snakebite. They offered no basis for their opinions of causation other than a temporal relationship between the onset of polyneuropathy and the snakebite. This causal link is questionable due to (a) Dabney’s medical history, which indicates many conditions and symptoms of polyneu-ropathy before the snakebite, (b) the fact that Dr. Cape did not have knowledge of Dabney’s full medical history of these conditions and symptoms, and (c) the absence of medical literature to establish that snake venom causes polyneuropathy. On the other hand, the testimony of the experts offered by Texas Gas/Liberty Mutual clearly demonstrated that copperhead venom does not affect the nervous system, but instead is a hemorrhagic toxin that affects the ability of the blood to clot.
¶ 73. This is not a case of dueling experts testifying about various causes of the Claimant’s polyneuropathy with one a “treating” and other retained expert. Rather, this is a case where the Dabney’s expert has offered an opinion based completely on unreliable history with no medical or scientific basis to support the *1101 finding. The employer/carrier’s experts offered credible and sufficient evidence that demonstrated that polyneuropathy could not be caused by a copperhead snakebite.
¶ 74. I am of the opinion that Dabney failed to prove that his polyneuropathy was caused by the snake bite. For this reason, I would reverse and render the Commission and the Circuit Court.
BRIDGES, P.J., JOINS THIS SEPARATE OPINION.

. In Dr. Cape's first deposition, taken September 18, 2000, he testified:
Q. How do you know that the snakebite that he says he sustained several years before you saw him is the cause of his peripheral polyneuropathy?
A. I only know by history and the other things I mentioned later. The history that the sensation and abnormalities came out at that time ...
Q. Would your opinion be different if he did not have complaints about these neurological problems immediately after the snakebite or within the first year after the snakebite?
A. Oh, yeah, if it didn't come out until I saw him three years later, yeah. Then I, of course, would state that it was a neuro-pathy we just didn’t know the etiology of and then ends up later on saying its an autoimmune neuropathy, and we can't find the cause for the autoimmune, the basis for it.
Q. So one of the basis for your opinion is the onset of neurological complaint of the patient shortly after the snakebite?
A. Right.

. Dr. Baxter, confirmed Dabney's known conditions of B-12 deficiency, diabetes and gas-trectomy caused or contributed to his peripheral polyneuropathy.